MARY N. HANSON, petitioner-respondent,

*v.*

HENRY C. HANSON, defendant-appellant.

[Submitted February term, 1932.  Decided May 16th, 1932.]

*Messrs. Benny & Cruden,* for the appellant.

*Mr. Christopher S. Degheri (Mr. Bernard M. Degheri,* of counsel), for the respondent.

The opinion of the court was delivered by

WELLS, J.

This is an appeal from a decree of the court of chancery granting a divorce to the petitioner on the ground of the adultery of the husband.

The petition alleges that the defendant at times, places and with persons unknown, committed adultery and that as a result thereof, he became infected with a venereal disease, known as gonorrhea, and that on March 1st, 1930, he communicated the same to petitioner.

Defendant denies the commission of the adultery and further denies that he ever had gonorrhea or any other venereal disease or that he communicated it to his wife; and in recrimination, the defendant charges the petitioner with having committed adultery with one S——.

There was no counter-claim filed by defendant because he admitted that he had condoned the alleged adultery of his wife.

The learned advisory master, who heard the case, found that the petitioner had sustained the allegations of the petition, and that the counter-charge of the defendant was not proved and he advised a decree of divorce for the petitioner.

The testimony in this case is very voluminous. Many of the nine hundred pages of testimony contain a recital of financial difficulties between the parties, and the causes and results of various disagreements, which shed very little, if any, light on the guilt or innocence of the parties.

There was a great deal of medical testimony offered by both sides as to the causes, nature, symptoms and diagnosis of the disease of gonorrhea; the petitioner undertaking to prove by her physicians that the defendant had it and inoculated her with it, and the defendant seeking to show that neither petitioner nor defendant had the disease.

The case, however, does not rest upon medical testimony alone.

There is much evidence as to the previous relations of the parties, and as to the habits and conduct of the defendant. Some of this rests on the uncorroborated and some on the corroborated testimony of the petitioner, and some on the testimony of other witnesses.

A full analysis of this testimony cannot be made within the proper limits of an opinion, and since the case is largely one of fact, a brief resume thereof would seem to be proper.

Petitioner and defendant were married on June 30th, 1915. The defendant had been previously married. His first wife divorced him on the ground of his desertion.

Petitioner and defendant lived together until the month of March, 1930. Their married life was not a happy one due, according to the petitioner's testimony, to financial differences, and her husband's compelling her to submit to numerous abortions, and to his paying attention to other women. He was a laborer and she was employed in a clerical capacity, the earnings of both being used in defraying the household expenses.

In the year 1928, petitioner developed a uterine growth which she said was caused by the abortions. Dr. Mary B. Carr examined her to ascertain if she had any venereal disease and found that she had none.

An operation to remove this growth was performed in November, 1928, and for some time thereafter she suffered from the effects of this operation, and she testified that from the time of this operation up to March 1st, 1930, she slept separate and apart from her husband and that she had no sexual intercourse with him.

He denies this and says that intercourse continued after her recovery from the operation up to March, 1930.

Shortly after the return of petitioner from Florida, where she had been from October, 1929, to January 30th, 1930, she became suspicious of her husband's physical condition. The suspicions seemed well grounded upon the facts observed and testified to by the wife. The defendant's explanation seems most puerile and unsatisfactory.

Petitioner testified that one day in February, 1930, she saw the defendant in the cellar using a syringe on his private parts and when she later spoke to him about this he struck her. He denied this *in toto*.

On March 1st, 1930, petitioner says that the defendant forced his way into her room and in spite of her resistance, compelled her to have intercourse with him. About two weeks after this she became ill and called in Dr. Carr, who, after treating her a few days at home, removed her to the Bayside Hospital, where she remained until July 7th, 1930.

During her stay at the hospital, she was examined by at least four physicians and her ailment was diagnosed as arthritis, due to gonorrheal infection.

Miss Reed, who was the proprietor and head nurse of the hospital, testified that Dr. Schwartz, who was called in by Dr. Mary B. Carr, made a thorough examination of the petitioner and that she was present when the doctors diagnosed the petitioner's case as gonorrheal arthritis and that when this report, as to the result of the diagnosis came back, she was requested by Dr. Carr to tell the defendant the nature of petitioner's illness, and that she took the defendant into the operating room and said to him, "Mr. Hanson, do you know what is wrong with your wife?" and that Mr. Hanson looked up and smiled and said, "yes." That she then said to him, "you have had a gonorrheal infection and have been treated for it, have you or have you not?" and that he said, "yes, I have." That he turned away and walked out with the remark that the petitioner would get over it, and that the defendant then went to his wife, who had been informed of the nature of her illness and was crying, and Miss Reed said she heard the petitioner say to the defendant, "please leave me alone." The defendant had been visiting

the hospital regularly up until that time and from that day he never returned.

Miss Reed further testified that she had charged the defendant with having communicated this disease to his wife and that he did not deny it.

Defendant admitted that Miss Reed had accused him of giving his wife gonorrhea but he says that he did not say a word to Miss Reed in reply, that he was so taken by surprise he didn't know what to say or do and furthermore that at the time he didn't know what she meant by gonorrhea; that he left Miss Reed and went to his wife and she accused him of giving her the disease and told him to get out and stay out, which he did.

The defendant claims that neither he nor his wife ever had gonorrhea. Dr. Joseph Koppel, who claimed to be an expert in venereal diseases, testified for the defendant that he had examined the defendant in the month of May, 1930, and again in November, 1930, and he found no evidence that the defendant then had or ever had had gonorrhea. On cross-examination he said that in uncomplicated cases of gonorrhea he could cure the disease in four or five weeks. He also admitted that he found in the defendant a stricture of the urethral canal which could be the result of a previous infection of gonorrhea but might be caused by other things, one of which was the use of strong antiseptic solutions with a syringe.

The doctor of the company, for which defendant worked, examined defendant in August, 1926, and November, 1930, in a general way and not especially for gonorrhea, and said that he found no evidence of the disease.

Dr. Koppel also testified that he had read all of the testimony given by the physicians of the petitioner and that in his opinion the examination made by these physicians was not of such a nature as to enable the physicians to testify with any degree of accuracy that the petitioner was suffering from a gonorrheal arthritis.

Much stress is made by Dr. Koppel upon the fact that the microscopic test made revealed no germ of the disease, and

yet on cross-examination the doctor admits that it might be present and the microscopic tests show negative.

Dr. Carr, who made the pelvic examination of the petitioner, and Dr. Benjamin, who was called in consultation, both state there were clinical evidences of the disease, and while the other two doctors called in by the petitioner are said to agree with this diagnosis, yet they were not called as witnesses in the case.

After a careful examination of the medical testimony, we cannot say that the advisory master was in error in believing the testimony of the physicians and nurse, who actually examined and treated the petitioner, rather than that of the defendant's expert who never saw or examined her.

We are not unmindful of the decisions heretofore rendered by this court in cases of this kind, such as in *Berckmans* v. *Berckmans, 17 N. J. Eq. 453,* cited in numerous subsequent decisions, in which Mr. Justice VanDyke, speaking for this court said, referring to proofs sufficient to establish adultery:

"The evidence must be such as to satisfy the human mind, and leave the careful and guarded judgment of the court free from any conscientious and perplexing doubts as to whether the charge be proved or not. If, after a careful examination of all the completed testimony, such doubts remain immovable, it is clearly our duty to give the defendant the benefit of such doubts, and to refuse the prayer of the complainant."

We are also mindful of the numerous decisions in our state, such as *Garrett* v. *Garrett, 86 N. J. Eq. 293,* holding, that a divorce will not be granted upon the uncorroborated testimony or admission of a party to the suit, and that not only does this rule apply to the cause but to every element in the proofs necessary to sustain it, but we are also familiar with a line of cases such as *Earl* v. *Earl, 81 N. J. Eq. 444,* which holds that admission of a defendant in a divorce suit that he had given his wife a secret disease is sufficient to sustain a decree, if sustained by corroborating circumstances.

There are many corroborating circumstances found in the petitioner's case. The petitioner testified that one evening she came home after having announced to her husband that

she intended to be away all night, and found a woman in her home with her husband, and that this woman was intoxicated. The defendant admits the incident but gives an entirely different explanation thereof, namely, that he met the woman in question on the street and that she asked him if he could give her a drink, and that he replied that he did not know, but if his wife was home he could ask her and that if the wife would give her the drink, it would be all right, and that he thereupon entered his home and went upstairs, called his wife and told her that Mrs. Spiro was here and had burnt her arm and could he give her a drink, and that his wife had told him he had better take this woman home and that he took her to her door and left her there.

The wife further testified that on one occasion she had observed her husband with a blond woman, in a jewelry store, and that he bought her a ring and that she had followed them to a house which they both entered, and that the defendant did not come home until two o'clock in the morning, and that on another occasion she was called on the telephone and was notified that her husband was with a blond woman in a theatre and that she went to the theatre named, waited on the outside until the show was over, and saw her husband coming out with a woman and when he saw her he ran, and that this woman was the same woman with whom petitioner saw him in the jewelry store; that the husband had left her for thirty-four days at one time and that while he was away, a woman called at the house and claimed that she was pregnant and that the defendant was responsible for her condition and threatened that unless he took care of her, she would make trouble for him; and on another occasion, petitioner was walking with her husband, when a woman came up to him and started to strike him with an umbrella. On another occasion after her return from Florida, in the month of February, 1930, another woman called and claimed that the defendant had given her a disease. Defendant says that none of these incidents happened.

There is no corroboration of petitioner as to many of the incidents which she recites.

There was testimony, corroborated by the police records, that a colored girl of bad reputation had made a complaint against defendant accusing him of fornication.

The defendant was brought before the police court to answer this charge but the charge was dismissed.

Defendant admitted that he had been arrested on this charge, that he was well acquainted with the father of this girl and occasionally called at the house to see them, but denied any improper relations with the girl. He never told petitioner about this and she heard about it a long time after it occurred.

The testimony of Mrs. Florence Soper, who was a friend of the defendant, as well as the petitioner, was that she had seen the defendant on many occasions with other women, that these occasions were mostly in the day time, when the petitioner was at work, and that she had seen him in the theatre with a woman, who was not the petitioner, and had again seen him on the trolley with the same woman and that she had seen him with other women on the streets of Jersey City. This was denied by the defendant.

There was also offered in evidence a certain letter taken by the petitioner from defendant's coat. This letter was from a woman and postmarked Dover, New Jersey, January 18th, 1926, and addressed to defendant at his Jersey City address, and was couched in most affectionate terms and indicated a relationship between defendant and the writer most intimate and reprehensible.

Defendant argues that this letter is not competent evidence against him and cites from *Cartan* v. *Cartan, 93 N. J. Eq. 175,* as follows:

"Letters written to a person, though evidence against him for some purposes, are not evidence of the truth of their contents unless besides the mere possession of the letters there is testimony from which acquiescence in the truth of their contents can be inferred."

The testimony showed that the petitioner did not abstract this letter from defendant's coat until several weeks after the postmarked date thereon.

While this letter may not be evidence of the truth of its contents in the absence of proof that defendant ratified the statements contained therein, yet the fact that defendant had preserved and secretly carried this kind of a letter about in his pocket for a long time, without mentioning the receipt or contents thereof to his wife, might make it evidential for the purpose of showing his attitude toward his wife, and toward the writer of the letter.

It would seem, however, that since the defendant made no objection to the introduction of this letter in evidence he can have no cause for complaint now.

It would serve no useful purpose to further discuss the petitioner's case and we turn to the defendant's charge of adultery of petitioner with one S——.

There is evidence that S——, who was employed by the same firm which employed the petitioner, spent considerable time at the home of the petitioner, when the defendant was out. The petitioner and S—— both claimed that their relation was purely of a business nature, that it was necessary to work over records in the evening and that the defendant knew of the visits of S—— to his wife's home and that he made no objection except once, which was later withdrawn.

While there is plenty of evidence of opportunity for adultery, yet there is no testimony of inclination except that petitioner and S—— were seen walking down the street arm in arm, and the testimony of a neighbor to the effect that he had seen the petitioner and S—— in the bathroom where S—— seemed to be washing the petitioner's hair. There is no evidence. however, of any affection and we think that the advisory master properly concluded that this charge had not been established.

The question presented to us as to the defendant's guilt is almost exclusively one of fact, and while the testimony is in many respects contradictory, nevertheless our examination of the whole case leads us to the conclusion that there was a plenary of evidence, sufficiently corroborated, to justify the learned advisory master, who had the opportunity of hearing and observing all the witnesses, in advising a decree of di-

vorce for the petitioner on the ground of the defendant's adultery.

The decree *nisi* will be affirmed.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, CAMPBELL, LLOYD, CASE, BODINE, DONGES, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, KERNEY, JJ.   14.

*For reversal*—None.